```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS

PAUL TILLSON,                          )
                                       )
     Plaintiff,                        )
                                       )
v.                                     )   CIVIL ACTION NO.
                                       )   08-10997-DPW
ODYSSEY CRUISES a/k/a PREMIER YACHTS,  )
INC., ENTERTAINMENT CRUISES, INC.,     )
JOHN DOES 1-10, ABC CORPS. 1-20,       )
                                       )
     Defendants.                       )
```

<u>MEMORANDUM AND ORDER</u>
January 27, 2011

Plaintiff Paul Tillson brought this action against several defendants, including Odyssey Cruises, a/k/a Premier Yachts, Inc. ("Premier Yachts"),[1] for injuries suffered due to the collapse of

---

[1] In his complaint, Plaintiff also asserted claims against Entertainment Cruises, Inc., a corporation formed by the merger of Odyssey Cruises, a/k/a Premier Yachts, Inc. ("Premier Yachts") and Spirit Cruises, Inc., and against John Does 1-20 and ABC Corps. 1-20, both of which represent fictitious names for any individuals or entities whose conduct or omission contributed to the causes of action alleged in the instance case. The parties entered a partial stipulation of dismissal as to Entertainment Cruises, Inc. on September 4, 2008, based upon the representation that this entity had no potential liability in this matter. Further, in the absence of any evidence adduced after the completion of discovery regarding the liability of any person or entity represented by the fictitious John Doe individuals and ABC entities, I will strike those defendants from the complaint. *See Glaros v. Perse*, 628 F.2d 679, 685 (1st Cir. 1980) (holding that a district court is not obligated to "wait indefinitely for [the plaintiff] to take steps to identify and serve the 'unknown' defendants."); *Kemper Ins. Cos., Inc. v. Fed. Exp. Corp.*, 115 F. Supp. 2d 116, 125 (D. Mass. 2000) ("the Doe fiction may only be used until such time as the actual identities can be learned."). Accordingly, Premier Yachts, Inc., is the only remaining defendant opposing the present motion.

his chair during a cruise dinner.  Tillson has moved for summary judgment on the issue of liability.  Having found that genuine disputes of material fact remain to be decided by a fact finder, I will deny Tillson's motion for summary judgment.

## I.   BACKGROUND

### A.   *The Incident*

On June 15, 2007, Tillson and his wife boarded the M/V ODYSSEY, owned and operated by Premier Yachts, at Rowes Wharf in Boston to attend a cruise dinner.  Tillson sat down on a chair at his table for the first time at 7:30 p.m.  During the three-hour dinner, Tillson left his table on three occasions.  Upon his return to the table at 10:45 p.m., Tillson attempted to sit on the chair he had been occupying throughout the evening.  At that time the chair's left rear leg "gave way or broke."  As the chair was settling to the left and rear, Tillson slipped to his left, while remaining seated, and eventually landed on the floor.  Before this incident, Tillson had not noticed any defect with the chair.  The parties later stipulated that the chair in question had "failed due to a cracked weld on its left rear leg."

When the M/V ODYSSEY returned to Rowes Wharf at 11:00 p.m. that night, Tillson signed a Notice of Injury or Illness with the First Mate on duty.  After walking off the vessel, Tillson and his wife boarded a water taxi and then walked for about a quarter

mile to their hotel.  Tillson contends that the collapse of the chair caused him to endure back and leg pain, headaches, as well as episodic urinary incontinence.

## B. *The Inspection and Condition of the Chairs Aboard the M/V ODYSSEY*

Several individuals testified about the practice of inspection, as well as the repairs made on the chairs of the M/V ODYSSEY.

According to Captain David C. McDevitt, the crew of the M/V ODYSSEY conducted safety checks of the vessel "[a]t least once a week."  In addition, Captain McDevitt and Jeffrey Taylor, the Ship's Master responsible for the maintenance of the equipment and the passengers' safety, would, as part of their regular duties, walk through the decks, allowing them to observe when a chair was bent.  In addition to the crew, the restaurant staff also had the opportunity to inspect the chairs while setting up for dinner cruises.  Safety inspections of the chairs were performed daily, according to Erica Gregory, a restaurant manager onboard the F/V ODYSSEY.  When the crew or the restaurant staff noticed a chair with a bent leg, that chair was removed from service to be repaired by employees of Premier Yachts, generally Jeffrey Taylor.

Nevertheless, the general condition of the chairs aboard the M/V ODYSSEY was far from impeccable.  According to Taylor, "most

of the chairs" had a bad lean and "some" of them had failed in the past:

> Q: Did you have any problems with these chairs on this ship? You switch them out in the first week of July --
> A: Yeah.
> Q: -- this accident happen[ed] in June. Do you have any knowledge of problems with these chairs; they're getting old; they had problems; they were failing?
> A: Yes.
> Q: Okay. Tell me about that.
> A: Let's see, the chairs were -- some of them would fail -
> Q: Um-hm.
> A: -- and go over to the side, and we would try to get those chairs and make repairs to them.
> . . .
> Q: What -- what knowledge do you have of other chairs failing, if you could?
> A: Most of the chairs we would see would be -- have a very bad lean to them --
> Q: Okay.
> A: -- the legs would be bent in. So that's what - we would pull it out of service for that.

Repairs on the chairs started in 2006 and continued throughout 2007, when the chairs were ultimately replaced. During that time period, approximately ten to twenty chairs would be repaired every month, according to Taylor.

When asked if he specifically recalled whether the chair causing the incident was ever repaired, Taylor replied that he did not.[2] However, Brian Morrissey of Marine Safety Consultants,

---

[2] Plaintiff attempts to show that Jeffrey Taylor admitted that the four photographs contained in the record depict the "actual chair" and that this chair had been repaired by Premier Yachts prior to the incident. However, the portion of Taylor's

-4-

Inc., an investigative firm retained by Premier Yachts, stated that the chair was "an original manufactured chair," which had not been previously repaired by Premier Yachts.

*C.  The Procedural History*

About two weeks after the incident, on July 2, 2007, Tillson called on Premier Yachts, in accordance with the relevant Terms and Conditions of the Passenger Contract, "to preserve any and all evidence in connection with this matter."  Brian Morrissey informed Tillson on January 18, 2008 that the chair had been "regrettably[] disposed of by [Premier Yachts] during the process of transferring the vessel's chairs to" another location on or about the same date the notice of claim had been received.

Tillson filed the complaint initiating this action on June 13, 2008, alleging violations of maritime tort law (Count I), maritime negligence (Count II), common law negligence (Count III), and products liability (Count IV) against the defendants. *See* Note 1 *supra*.  In his complaint, Tillson alleged federal jurisdiction based on the diversity of citizenship of the

---

deposition on which Plaintiff purports to rely shows only that Taylor admitted simply that the first photograph, referred to as Taylor Exhibit 1, depicted a chair that had been welded.  Brian Morrissey, the person who took these photographs, testified that the four photographs actually depict *two* different chairs and that the first photograph, otherwise referred to as Taylor Exhibit 1, shows another chair that had previously been repaired by Premier Yachts, not the subject chair.  The subject chair is only depicted in the photograph referred as Taylor Exhibit 4 and was not identified as welded.

parties, 28 U.S.C. § 1332, and this Court's admiralty jurisdiction, 28 U.S.C. § 1333. Tillson filed the motion for summary judgment now before me on the issue of liability following completion of discovery.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).[3]

"A genuine dispute is one that could be resolved in favor of either party, and a material fact is one that has the potential of affecting the outcome of the case." *Vera v. McHugh*, 622 F.3d 17, 26 (1st Cir. 2010) (quoting *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)).

A district court ruling on a motion for summary judgment must view "the facts in the light most favorable to the non-moving party." *Meléndez v. Autogermana, Inc.*, 622 F.3d 46, 49 (1st Cir. 2010) (quoting *Roman v. Potter*, 604 F.3d 34, 38 (1st Cir. 2010)). Nevertheless, "the non-moving party must put forth

---

[3] Federal Rule of Civil Procedure 56 was amended effective December 1, 2010. *See* FED. R. CIV. P. 56 advisory committee's note, 2010 amendments. But "[t]he standard for granting summary judgment remains unchanged." *Id.* Although the pending motion for summary judgment was filed prior to December 1, 2010, the language of Rule 56 as amended nevertheless applies here because applying such language is not infeasible and does not work an injustice. *See* FED. R. CIV. P. 86(a).

specific facts to support the conclusion that a triable issue subsists" in order to overcome a motion for summary judgment. *Vega-Colón v. Wyeth Pharm.*, 625 F.3d 22, 25 (1st Cir. 2010) (quoting *Martínez-Rodríguez v. Guevara*, 597 F.3d 414, 419 (1st Cir. 2010)). This requires the non-moving party to "present definite, competent evidence to rebut the motion." *Id.* "If the nonmovant fails to make this showing, then summary judgment is appropriate." *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

### III. DISCUSSION

#### A. *Governing Law*

As a threshold matter, the parties appear to be uncertain as to which law, either maritime or Massachusetts, governs the present dispute. It is axiomatic that "[t]he legal rights and liabilities arising from [injuries sustained aboard a ship upon navigable waters are] within the full reach of the admiralty jurisdiction and measurable by the standards of maritime law."[4] *Kermarec v. Compagnie Générale Transatlantique,* 358 U.S. 625, 628 (1959). The Admiralty Clause of the United States Constitution prohibits any attempts that would be made by the States "to modify or displace essential features of the substantive maritime

---

[4] This conclusion is consistent with the Terms and Conditions of the Passenger Contract, which provides for the application of the "general maritime law of the United States."

law." *Carey v. Bahama Cruise Lines*, 864 F.2d 201, 207 (1st Cir. 1988) (quoting *Md. Cas. Co. v. Cushing*, 347 U.S. 409, 429 (1954)).

Because Tillson claims he was injured aboard a ship upon navigable waters, the present case therefore is governed by maritime law. To establish negligence under maritime law, a plaintiff must "demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury." *Evans v. Nantucket Cmty. Sailing, Inc.*, 582 F. Supp. 2d 121, 137 (D. Mass. 2008) (quoting *Canal Barge Co., Inc. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000)) (alteration in original).

## B. *Duty of Care*

It is well-settled that owners or operators of cruise ships owe a duty of care to their passengers. In the context of a maritime personal injury, the Supreme Court has observed that "the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances of each case." *Kermarec,* 358 U.S. at 632; *see also* ROBERT FORCE & MARTIN J. NORRIS, THE LAW OF MARITIME PERSONAL INJURIES, § 8.2 (5th ed. 2004). "The extent to which the circumstances surrounding maritime travel are different from those encountered in daily

life and involve more danger to the passenger, will determine how high a degree of care is reasonable in each case." *Monteleone v. Bahama Cruise Line, Inc.*, 838 F.2d 63, 65 (2d Cir. 1988) (quoting *Rainey v. Paquet Cruises, Inc.*, 709 F.2d 169, 172 (2d Cir. 1983)). "In other words, under certain situations, reasonable care may be a very high degree of care and in another situation it may be less." *Muratore v. M/S Scotia Prince*, 845 F.2d 347, 353 (1st Cir. 1988).[5]

Because a defective chair is "a condition in no way peculiar to maritime travel," *Rainey*, 709 F.2d at 172, I will measure Premier Yachts' conduct against a standard of ordinary reasonable care. *See Monteleone*, 838 F.2d at 65 (applying "a standard of ordinary reasonable care" where the injury was caused by a protruding screw on a cruise ship). Having identified the existence and scope of the duty owed by Premier Yachts to Tillson, I now turn to whether Premier Yachts breached this duty[6]

---

[5] For instance, some courts have described this duty as a "highest degree of care." *O'Connor v. Chandris Lines, Inc.*, 566 F. Supp. 1275, 1279 (D. Mass. 1983) (applying this standard to the collapse of a bunk on the plaintiff in sleeping quarters of a cruise ship). Others have discussed whether a passenger is owed a "very high degree of care" or "reasonable care under the circumstances." *See Rainey v. Paquet Cruises, Inc.*, 709 F.2d 169, 170-72 (2d Cir. 1983) (discussing the applicable standard where plaintiff's injuries were caused by the presence of a stool on dance floor).

[6] Although Tillson mainly focuses on the application of the *res ipsa loquitur* doctrine in his Memorandum in Support of Summary Judgment, he appears to claim in his Reply that a traditional negligence theory is also applicable to the facts of the case.

and, separately whether the doctrine of *res ipsa loquitur* applies.

## C.     *Breach of Duty*

Premier Yachts relies on three separate grounds to show that genuine dispute of material fact exist as to whether it exercised reasonable care: the absence of notice of the defective condition, the lack of foreseeability of Tillson's alleged injuries, and a deficient practice of inspection in place aboard the M/V ODYSSEY.  Premier Yachts relies on two decisions in which the courts either reversed summary judgment on the ground that the injured passenger could not show that the shipowner had notice of the hazardous condition, *Monteleone,* 838 F.2d at 65-66, or denied summary judgment because a genuine dispute of material fact remained as to whether the incident was otherwise foreseeable, *McDonough v. Celebrity Cruises, Inc.*, 64 F. Supp. 2d 259, 263-65 (S.D.N.Y. 1999).  But in these two cases, there was no evidence of previous incidents associated with the hazardous condition.  *Monteleone,* 838 F.2d at 66; *McDonough*, 64 F. Supp. 2d at 265.  Tillson, by contrast, contends that Premier Yachts had ample notice of prior defects associated with the chairs given the number of chairs that were repaired.

Although Tillson's argument is not without force, the question whether Premier Yachts had notice of a defective condition, or more generally whether it failed to exercise reasonable care under the circumstances, is a question for the

fact finder. Tillson's argument is solely based on the fact that the general condition of the chairs onboard the M/V ODYSSEY was apparently poor and the chairs seem to have required frequent repairs. This argument does find support in the testimony of Jeffrey Taylor, the Ship's Master responsible for the maintenance of the equipment and the passengers' safety, who admitted that "most of the chairs" had a bad lean or "some" of them had failed in the past. Quantitatively, that meant that approximately 10 to 20 chairs had to be repaired every month from 2006 throughout sometime in 2007, when the chairs were eventually replaced.

However, other record evidence suggests that the exercise of due care by Premier Yachts is a disputed factual issue preventing summary disposition. There is sufficient evidence to show that a reasonable program of inspection of the chairs was in place onboard the M/V ODYSSEY. Members of both the crew and the restaurant staff testified that safety checks of the chairs were conducted, both weekly or daily, on board the vessel. When a chair was observed with a bad lean, it would be removed from service and repaired by Premier Yachts. In addition, while the condition of the chairs frequently required repairs, the record is devoid of any evidence of complaints or injuries caused by a failed chair prior to the incident. The absence of any previous chair-related incidents in this case can support an inference that the accident "alleged by [Tillson] was not necessarily foreseeable, or that the operator took reasonable care under the

circumstances." *McDonough*, 64 F. Supp. 2d at 265.

To conclude as a matter of law that Premier Yachts had notice of the chairs' defective condition would require a finding that the condition was present "for a sufficient interval of time to invite corrective measures." *Monteleone*, 838 F.2d at 65 (quoting *Dann v. Compagnie Générale Transatlantique*, 45 F. Supp. 225, 226 (E.D.N.Y. 1942)). In the absence of a demonstration that any chair — let alone the chair at issue here — previously caused any injuries or complaints, the fact that even a high number of repairs has been made on various chairs in the vessel's collection, without previously causing any injuries or complaints, is insufficient to show that Premier Yachts had actual or constructive notice of the defective condition of the chair causing the injury to Tillson. Here, there is no indication that the subject chair had been defective in the past.

According to Morrissey, that chair was "an original manufactured chair," which had not been previously repaired by Premier Yachts.[7] Tillson sat on the chair during a three-hour cruise prior to the incident, without noticing any defect. That, in itself, supports an inference that the defect could not have been discovered upon proper inspection. *See Monteleone,* 838 F.2d at 66 (vacating district court's judgment in favor of plaintiff

---

[7] I note and discuss Tillson's erroneous contention that Taylor identified the subject chair as having been repaired previously in Note 2 *supra.*

on the ground that "the record is devoid of any evidence indicating that the condition of the screw existed long enough to put [defendant] on notice."); *Adams v. Carnival Corp.*, No. 08-22465, 2009 WL 4907547, at *4 (S.D. Fl. Sept. 29, 2009) ("There is no evidence, by contrast, that any defect in the chair, including an inability to support [plaintiff]'s weight, 'existed long enough' or was even capable of detection to put [the defendant] on notice,") (citation omitted); *Hood v. Regency Maritime Corp.*, No. 99-10250, 2000 WL 1761000, at *4 (S.D.N.Y. Nov. 30, 2000) ("Without . . . any interval of time within which to remedy a potential defect, the defendants cannot be held liable for the injuries sustained by the plaintiff.").

### D.  *Res Ipsa Loquitur*

Tillson principally relies on the doctrine of *res ipsa loquitur* in an attempt to satisfy his burden of proof that Premier Yachts was negligent.  But the doctrine is not sufficient to meet that burden for two reasons: (1) the doctrine of *res ipsa loquitur* simply means that an inference of negligence *may* be drawn and, in this case, and (2) Premier Yachts has raised a genuine dispute of material fact as to the applicability of the doctrine.

### 1.  A Theory of Evidence, Not A Theory of Liability

The doctrine of *res ipsa loquitur* is not on its own dispositive of the question of negligence; it merely permits a trier of fact to draw an inference of negligence when certain

conditions are met.  *See Jesionowski v. Boston & M. R.R.*, 329 U.S. 452, 456 (1947); *Ryba v. LaLancette*, 417 F. Supp. 2d 199, 207 (D. Mass. 2006) ("The doctrine of *res ipsa loquitur* permits a trier of fact to draw an inference of negligence, in the absence of evidence of breach of duty or causation, in certain limited circumstances.").  DAN B. DOBBS, ROBERT E. KEETON & DAVID G. OWEN, PROSSNER AND KEETON ON TORTS, § 40, p. 259 (5th ed. 1984) ("The trend has been toward viewing res ipsa loquitur as raising only a permissible inference which merely gets the plaintiff to the jury.").  This means that the trier of fact is permitted, yet not compelled, to draw this inference.  *Johnson v. United States*, 333 U.S. 46, 48 (1948) ("The rule of res ipsa loquitur . . . means that the facts of the occurrence warrant the inference of negligence not that they compel such an inference.") (internal quotation marks and citations omitted).

As a general principle, the doctrine of *res ipsa loquitur* is therefore viewed as a theory of *evidence*, rather than as an independent grounds for *liability*.  *Sultis v. Gen. Motors Corp.*, 690 F. Supp. 100, 102 (D. Mass. 1988) ("The doctrine of res ipsa loquitur is not a theory of liability."); *see also Hofer v. Gap, Inc.*, 516 F. Supp. 2d 161, 172 n.12 (D. Mass. 2007) ("*Res ipsa loquitur*, however, is not a separate cause of action . . ., but rather a means by which a jury may infer negligence through the occurrence of an unusual event").  As such, *res ipsa loquitur* is commonly raised by plaintiffs to "escape[] a nonsuit, or a

dismissal of [their] case, since [if the doctrine applies] there is sufficient evidence to go to the jury." DAN B. DOBBS, ROBERT E. KEETON & DAVID G. OWEN, PROSSNER AND KEETON ON TORTS, § 40, p. 258 (5th ed. 1984). It is, however, less common for plaintiffs to use the doctrine as a way to secure a favorable summary judgment ruling on the issue of liability. Courts have generally been reluctant to grant summary judgment to plaintiffs merely upon demonstration of the predicates for the doctrine's application. *See*, *e.g.*, *Harms v. Lab. Corp. of Am.*, 155 F. Supp. 2d 891, 907 (N.D. Ill. 2001) ("Courts are very reluctant to grant summary judgment for a plaintiff under the doctrine of *res ipsa loquitur*."); *Morejon v. Rais Constr. Co.*, 851 N.E.2d 1143, 1146-47 (N.Y. 2006) (holding that summary judgment for a plaintiff on a *res ipsa loquitur* theory should be a rare event, granted "only when the plaintiff's circumstantial proof is so convincing and the defendant's response so weak that the inference of defendant's negligence is inescapable."); *Rathvon v. Columbia Pac. Airlines*, 633 P.2d 122, 130-31 (Wash. Ct. App. 1981) ("The doctrine of res ipsa loquitur, in and of itself, is thus insufficient to support a summary judgment for a plaintiff unless the facts are undisputed.").

2.  Applying the Doctrine

The doctrine of *res ipsa loquitur* applies "when an accident is of the kind that does not ordinarily happen unless the defendant was negligent in some respect and other responsible

causes including conduct of the plaintiff are sufficiently eliminated by the evidence." *Hofer,* 516 F. Supp. 2d at 172 (quoting *Enrich v. Windmere Corp.*, 616 N.E.2d 1081, 1085 (Mass. 1993)). Three conditions are necessary for this doctrine to apply: "(1) the event must be one that does not ordinarily occur in the absence of negligence; (2) the evidence must sufficiently eliminate the plaintiff's and others' conduct as the cause of the event; and (3) the alleged negligence must fall within the scope of the defendant's duty to the plaintiff." *Ryba*, 417 F. Supp. 2d at 207.

Premier Yachts argues that it did not have "exclusive control" of the subject chair, as required by the second element of the doctrine. In particular, Premier Yachts contends that not only Tillson but "numerous other passengers" had access to the subject chair throughout the night of the incident. For his part, Tillson responds that there is no evidence in the record that he or any other passenger did anything other than sit on the chair in question. In this connection, Tillson relies on *O'Connor v. Chandris Lines*, a case where the plaintiff sustained an injury as a result of the collapse of a bunk located in the sleeping quarters of a cruise ship. 566 F. Supp. 1275, 1276 (D. Mass. 1983).[8] In *O'Connor*, Judge Julian applied the doctrine of

---

[8] I note that Tillson also cites two additional — non maritime — cases, in which the Supreme Judicial Court applied the Massachusetts doctrine of *res ipsa loquitur* in the collapsed chair context. *Couris v. Casco Amusement Corp.*, 133 N.E.2d 250,

*res ipsa loquitur* on the ground that "[t]he evidence does not disclose any other probable explanation for the collapse of the bunk except the negligence of the defendant in permitting the bunk to be or remain in a defective condition." *Id.* at 1280. The present case is easily distinguishable from *O'Connor*. *First*, the Court in *O'Connor* was sitting without a jury, after a trial on the merits, whereas the present dispute is at the summary judgment stage. *Id.* at 1275. *Second*, one of the rationales for the court's application of the doctrine of *res ipsa loquitur* was that "[t]he only persons in the cabin when the bunk collapsed and fell on the plaintiff were the plaintiff and her husband." *Id.* at 1279-80. By contrast, Premier Yachts alleges that "numerous other passengers" aboard the M/V ODYSSEY had access to the subject chair at or about the time of the incident. In this connection, Tillson admitted that he left his chair on three separate occasions prior to the incident. *O'Connor* and similar cases, *see* Note 5 *supra*, do not fully support Tillson's request for summary judgment. I find that Premier Yachts has raised a material dispute of fact as to whether it had exclusive control over the subject chair at the time of the incident. *See Rockey*

---

252 (Mass. 1954); *Matthews v. L. & L. Enters., Inc.*, 50 N.E.2d 815, 816 (Mass. 1943). In these two cases however, the notion of exclusive control was neither raised by the defendant nor discussed by the court. In addition, neither of these cases were decided at the summary judgment stage. *Couris*, 133 N.E.2d at 252 (ruling on motion to set aside the judgment filed by defendant); *Matthews,* 50 N.E.2d at 816 (ruling on an exception to the denial of the defendant's motion for a directed verdict).

*v. Royal Carribean Cruises, Ltd.*, No. 99-708, 2001 WL 420993, at *6 (S.D. Fl. Feb. 20 2001) (denying defendant's motion to strike *res ipsa loquitur* count where "a material issue of fact has been created as to whether the Defendant had exclusive control over the bingo board [causing the injury] at the time of the incident").

More broadly, Premier Yachts contends that a predicate for a *res ipsa loquitur* finding is that the Defendant had notice of the defective condition of the chair. This argument is supported by several cases in the maritime context. Also consistent with this argument is a decision of the Appellate Division of the Massachusetts District Court in *Giacomelli v. Massachusetts Greyhound*, a case heavily, but erroneously relied upon by Tillson. No. 584, 1991 WL 229957 (Mass. App. Div. Nov. 4, 1991). The Court in *Giacomelli* refused to apply the doctrine of *res ipsa loquitur* "where the plaintiff sat in the chair for about an hour and apparently did not detect any weakness," thereby making the defect not detectable from normal inspection and making it impossible for the defendant to have had notice of it. *Id.* at *2. *See, e.g., Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989) (per curiam) ("a prerequisite to imposing liability [is] that the carrier . . . had actual or constructive notice of the risk-creating condition."); *Adams*, 2009 WL 4907547, at *5 ("the mere fact that an accident occurred or that [the plaintiff] asserts a *res ipsa*

*loquitur* action does not obviate the need to show that [the defendant] had notice."); *Hood v. Regency Maritime Corp.*, No. 99-10250, 2000 WL 1761000, at *4 (S.D.N.Y. Nov. 30, 2000) ("Without notice of any sort . . . the defendants cannot be held liable for the injuries sustained by the plaintiff.").[9]

### IV. CONCLUSION

For the reasons set forth more fully above, I DENY Plaintiff's motion for summary judgment. (Dkt. No. 31.)

/s/ Douglas P. Woodlock
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

[9] As additional grounds to defeat summary judgment, Premier Yachts argues that Tillson has failed to prove causation as a requisite element of his negligence claim. I disagree. As a basis for its contention, Premier Yachts relies on the report established by Michele Masi, M.D., a Board Certified Neurologist retained by Premier Yachts to examine Tillson's medical reports. In her report, Dr. Masi concluded that there was no evidence of causation between the incident and Tillson's exacerbated headache syndrome or his report of urinary incontinence. But Dr. Masi also concluded that Tillson suffered "injury related to the fall from the collapsed chair on 6/15/07 [in the form of] transient lumber strain," yet "without worsening of the L4-5 disc herniation already noted in the 1/2007 scan per formal radiology review." The mere fact that there was no worsening of the "L4-5 disc herniation" is irrelevant for purposes of causation so long as Dr. Masi has found that the collapse of the chair caused Tillson a transient, yet minor, lumber strain. This finding is sufficient to show causation. As noted by Tillson, the extent of his injury is a damage issue; not a liability issue. Damages are not the subject of the present motion.